UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ALEXANDER MASCAL,
                    Plaintiff,


v.                                              CIVIL ACTION No._____


MAINE DEPARTMENT OF
CORRECTIONS,

LONG CREEK YOUTH DEVELOPMENT
CENTER,

JOSEPH PONTE, Commissioner of Maine
Department of Corrections,

JOSEPH FITZPATRICK, Commissioner of
Maine Department of Corrections,

JEFFREY MORIN II, Superintendent of
Mountain View Youth Development Center,

JEFFREY MERRILL, Superintendent of Long
Creek Youth Development Center,

JEFFREY VANCE, Juvenile Facility
Operations Supervisor,

JEFFREY MACOMBER, Juvenile Program
Specialist,

BERRY LEMERY, Juvenile Facility
Operations Supervisor,

FRANCIS BOUCHARD, Juvenile Program
Specialist,

SCOTT JANOSIK, Juvenile Program
Manager,

ELIA ATKINSON, Juvenile Program Worker,

CHAD STURGIS, Juvenile Program Worker,

1

JAMES BROOKER, Juvenile Program
Worker,

CHAD YOUNG, Juvenile Program Worker,

PHILIP STALEY, Juvenile Program Worker,

JOSEPH FAGONE, Maine Department of
Corrections Investigator,
                    Defendants.

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff Alexander Mascal, by and through his attorneys, and complains against the Defendants as follows:

## INTRODUCTION

This is a civil rights case challenging excessive use of isolation, excessive use of force and restraint, sexual assault, and statutory violations occurring at Long Creek Youth Development Center (hereafter "Long Creek") and Mountain View Youth Development Center (hereafter "Mountain View") from 2012 to 2016.

Alexander was just fourteen years old when he was first committed to the custody of the Maine Department of Corrections (hereinafter "MDOC"). Alexander came from a difficult home life: his parents struggled with substance use disorders, and he witnessed their volatile separation. After their divorce, Alexander and his two younger siblings bounced around to different homes with their mother until they were eventually sent to live with their father. In addition to instability at home, Alexander had multiple mental health diagnoses, including a history of psychiatric hospitalization. By the time he was committed to the MDOC, Alexander had well-documented health needs and trauma history. He needed care. He needed treatment. He needed support.

Under the United States and Maine Constitutions, all incarcerated people have a right to freedom from cruel and unusual punishment. Const. amend VIII.  However, as a society we have come to understand that children are different. As such, our obligations to incarcerated children are necessarily also different than our obligations to adults. *See In re Gault*, 387 U.S. 1, 15-16 (1967) ("The early reformers were profoundly convinced that society's duty to the child could not be confined by the concept of justice alone… The child was to be 'treated' and 'rehabilitated' and the procedures, from apprehension through institutionalization, were to be 'clinical' rather than punitive"). Whereas juvenile justice involved children are not afforded the same procedural process as adults,[1] in exchange they are promised placement in a system predicated on rehabilitation, care, and treatment. *See State v. Gleason*, 404 A.2d 573, 579 (Me. 1979) ("The benevolent purposes of our prior juvenile laws remain uppermost. Our Code creates a separate and distinctive juvenile justice system designed primarily for the rehabilitation, not the punishment, of the young offender."). Moreover, where a juvenile court forcibly removes a child from their home and care of their parents, an affirmative duty falls on the state to provide for the child as if their parent – to keep them safe, ensure their care, and promote their healthy development while in their custody. *Shone v. State*, Me., 237 A.2d 412, 417 (1968) ("The benevolent purposes intended by our statute, [15 M.R.S. § 3002 et seq.], to provide for our juvenile offenders that care, custody, and discipline as nearly as possible approximating that which they should receive from their parents or guardians, and as far as practicable treatment"); *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (recognizing substantive rights under the Due Process Clause of the Fourteenth Amendment of institutionalized individuals to safety, freedom from unreasonable restraint, and care).  Under

---

[1] *E.g. State v. Gleason*, 404 A.2d 573 (juvenile did not have constitutional right to grand jury indictment, release on cash bail, and jury trial).

3

Maine law, the MDOC is the state agency statutorily responsible for ensuring Maine's incarcerated children are provided with constitutionally mandated care and treatment. 34-A M.R.S. § 7001.

At the time of Alexander's initial commitment, the MDOC staff knew, or should have known, that an environment free from neglect, abuse, and violence is a necessary prerequisite to any child's health and development. They also knew that due to his mental health and trauma history, Alexander was especially vulnerable. Nevertheless, in clear breach of MDOC's constitutional obligations and statutory duties, while in their custody, Alexander was repeatedly subjected to violent attacks and excessive use of restraints by MDOC staff; punished by placement in solitary confinement for unnecessarily extended durations of time; and systematically denied appropriate accommodation of his disabilities. Finally, for nearly two years, Alexander was sexually abused by a Long Creek guard.

In other words, Maine's juvenile justice system, by and through MDOC staff, failed it its obligations to Alexander. From the moment the doors of Mountain View closed behind him, Alexander found himself trapped in veritable black box, defenseless to abuse and neglect at the hands of facility staff. When he cried out for help, the system worked in concert to further criminalize him, ensuring he would spend the remainder of his childhood and much of his young adult life behind bars.

From Long Creek, Alexander was funneled directly into Maine's adult criminal justice system. He continues to experience daily suffering from the emotional and physical injuries inflicted on him by Mountain View and Long Creek staff. Finally, Alexander has spent years extricating himself from the abusive sexual relationship that began when he was just a child incarcerated at Long Creek.

## PARTIES

1.      Plaintiff Alexander Mascal is a resident of Litchfield, Maine.

2.      Defendant Maine Department of Corrections ("MDOC") is the department under which Maine's youth detention facilities are operated. 34-A M.R.S. § 1202. MDOC is "responsible for the direction and general administrative supervision, guidance and planning of adult and juvenile correctional facilities and programs within the State." *Id*.

3.      Defendant Long Creek Youth Development Center ("Long Creek") is a state-run center for the incarceration of juveniles. 34-A M.R.S. §§ 3801, 3802. As of 2015, it is the sole juvenile detention center in Maine.

4.      Defendant Joseph Ponte was Commissioner of Corrections for the Maine Department of Corrections from 2012 to 2014.  In that role, he had "general supervision, management and control of the research and planning, grounds, buildings, property, officers, employees and clients of any correctional facility, detention facility or correctional program." 34-A M.R.S. § 1402(1).  At all times relevant to this Complaint, Commissioner Ponte acted under color of state law. He is sued in his official and individual capacity.

5.      Defendant Joseph Fitzpatrick was Commissioner of Corrections for the Maine Department of Corrections from 2014 through 2016. In that role, he had "general supervision, management and control of the research and planning, grounds, buildings, property, officers, employees and clients of any correctional facility, detention facility or correctional program." 34-A M.R.S. § 1402(1).  At all times relevant to this Complaint, Commissioner Fitzpatrick acted under color of state law. He is sued in his official and individual capacity.

6.      Defendant Jeffrey Morin II was Superintendent of Mountain View from 2012 to 2017. Upon information and belief, one of the Superintendent's duties is to review incident reports,

including incidents involving excessive force against juveniles, and to ensure the facility is in compliance with all state and federal regulations. At all times relevant to this Complaint, Superintendent Morin acted under color of state law. He is sued in his official and individual capacity.

7.      Defendant Jeffrey Merrill was Superintendent of Long Creek Youth from 2013 to 2017. Upon information and belief, one of the Superintendent's duties is to review incident reports, including incidents involving excessive force against juveniles, and to ensure the facility is in compliance with all state and federal regulations. At all times relevant to this Complaint, Superintendent Merrill acted under color of state law. He is sued in his official and individual capacity.

8.      Defendant Jeffrey Vance was a Juvenile Facility Operations Supervisor at Mountain View during the relevant period from 2012 to 2014, and was an agent of MDOC and Mountain View. At all times relevant to this Complaint, Officer Vance acted under color of state law. He is sued in his individual capacity.

9.      Defendant Jeffrey Macomber was a Juvenile Program Specialist at Mountain View during the relevant period from 2012 to 2014, and was an agent of MDOC and Mountain View. At all times relevant to this Complaint, Officer Macomber acted under color of state law. He is sued in his individual capacity.

10.      Defendant Barry Lemery was a Juvenile Facility Operations Supervisor during the relevant period from 2014 to 2016, and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Lemery acted under color of state law. He is sued in his individual capacity.

11.     Defendant Francis Bouchard was a Juvenile Programs Specialist during the relevant period from 2014 to 2016, and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Bouchard acted under color of state law. He is sued in his individual capacity.

12.     Defendant Scott Janosik was a Juvenile Program Manager at Long Creek during the relevant period from 2014 to 2016, and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Janosik acted under color of state law. He is sued in his individual capacity.

13.     Defendant Elia Atkinson was a Juvenile Program Worker at Long Creek during the relevant period from 2014 to 2016, and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Atkinson acted under color of state law. She is sued in her individual capacity.

14.     Defendant Chad Sturgis was a Juvenile Program Worker at Long Creek during the relevant period from 2014 to 2016, and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Sturgis acted under color of state law. He is sued in his individual capacity.

15.     Defendant James Brooker was a Juvenile Program Worker at Long Creek, during the relevant period from 2014 to 2016 and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Brooker acted under color of state law. He is sued in his individual capacity.

16.     Defendant Chad Young was a Juvenile Program Worker at Long Creek, during the relevant period from 2014 to 2016 and was an agent of MDOC and Long Creek. At all times

relevant to this Complaint, Officer Young acted under color of state law. He is sued in his individual capacity.

17.    Defendant Michael Mullin was a Juvenile Program Worker at Long Creek during the relevant period from 2014 to 2016, and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Mullin acted under color of state law. He is sued in his individual capacity.

18.    Defendant Phillip Staley was a Juvenile Program Worker at Long Creek during the relevant period from 2014 to 2016, and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Staley acted under color of state law. He is sued in his individual capacity.

19.    Defendant Joseph Fagone was a Corrections Investigator at Long Creek during the relevant period from 2014 to 2016, and was an agent of MDOC and Long Creek. At all times relevant to this Complaint, Officer Fagone acted under color of state law. He is sued in his official and individual capacity.

## JURISDICTION

20.    This action seeks to vindicate rights guaranteed by the Fourteenth Amendment and Eighth Amendment of the United States Constitution, and it is brought pursuant to 42 U.S.C. § 1983.

21.    This action is also brought pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, and § 504 of the Rehabilitation Act, 29 U.S.C. § 794(d).

22.    This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law. Jurisdiction is also authorized pursuant to 28 U.S.C. §1343(a)(3)

23.    Pursuant to 28 U.S.C. § 1367(a), this Court possesses supplemental jurisdiction over state law claims under the Maine Civil Rights Act, 5 M.R.S. §§ 4681-85, and the Maine Tort Claims Act, 14 M.R.S. §§ 8101-8118.

24.    Venue in this Court is proper under 28 U.S.C. § 1391(b) because the events giving rise to this action occurred within this judicial district and because the Defendants are subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

25.    Beginning when he was just fourteen years old and continuing until his release from the Cumberland County Jail ("CCJ") in February 2017, Alexander was confined to the custody of the MDOC.

26.    Specifically, from May 2012 to March 2014, Alexander was confined to the custody of Mountain View. In March 2014, he was transferred to Long Creek where he remained until April 2016. From Long Creek, he was transferred directly to CCJ. He was released in February 2017.

27.    Pursuant to the Fourteenth Amendment of the United State Constitution, for all periods material hereto, Alexander had a substantive due process right to safety, freedom from unreasonable restraint, and care.

28.    Pursuant to the Eight Amendment of the United States Constitution, for all periods material hereto, Alexander had a constitutional right to be free from cruel and unusual punishment.

29.    Pursuant to Article I, § 1 of the Maine Constitution, for all periods material hereto, Alexander had state constitutional right to "safety."

30.    Pursuant to Article I, § 6 and §6-A of the Maine Constitution, for all periods material hereto, Alexander had a state constitutional right not to "be deprived of life, liberty, property, privileges," and a right to "due process."

31.    Pursuant to Article I, § 9 of the Maine Constitution, for all periods material hereto, Alexander had state constitutional right to safety and to be free from cruel and unusual punishment.

32.    Pursuant to the Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, and §504 of the Rehabilitation Act, 29 U.S.C. § 794(d), for all the periods material hereto, Alexander had the right to be free from discrimination on account of his disability and reasonable accommodation of his disability.

33.    For all the periods material hereto, the stated purpose of the Maine Juvenile Code was to "secure for any juvenile removed from the custody of the juvenile's parents the necessary treatment, care, guidance and discipline to assist that juvenile in becoming a responsible and productive member of society." 15 M.R.S. § 3002(1)(D).

34.    For all the periods material hereto, the MDOC was statutorily responsible for ensuring the provision of services necessary to support and rehabilitate children who came in contact with the Juvenile Court, 34-A M.R.S. §7001(1)(B), for meeting the service needs for rehabilitation of children adjudicated as having committed a juvenile crime, 34-A M.R.S. § 7001(2), and for training personnel to perform these functions. 34-A M.R.S. § 7002(5).

35.    Despite these constitutional and statutory obligations, throughout his incarceration Alexander was repeatedly subjected to unconstitutional conditions of confinement, neglect, and abuse at the hands of the MDOC and its staff.

## Excessive Use of Isolation

36.     The deleterious effects of placing children in solitary confinement has been extensively documented. See e.g Kayla James & Elena Vanko, *The Impacts of Solitary Confinement, Vera Institute for Justice* (April 2021) https://bit.ly/3swtdab (Citing multiple studies documenting psychological, neurological, and physiological harms of use of solitary confinement and noting specific harmful impact on youth, individuals with mental illness, and individuals with disabilities; Laura Dimon, *How Solitary Confinement Hurts the Teenage Brain*, The Atlantic (June 30, 2014) https://bit.ly/35IYz4o. Even just short stays in solitary confinement can cause serious and lasting impacts on a child's developing brain, mental health, and physical health. *Id.* These risks are further compounded for children with underlying mental health conditions.  James & Vanko, *The Impacts of Solitary Confinement* at 9.

37.     In Maine, lawmakers codified strict limitations on placement of children in solitary confinement as early as 1975. *See* An Act to Provide Minimum Standards for the Protection of the Rights of Residents of Public Institutions, 15 M.R.S.A § 2720 (1975).

38.     Under Maine law, a child may only be placed in solitary confinement if: (1) the child presents a high likelihood of imminent harm to themselves or others; (2) presents a substantial and imminent threat of destruction of property; or (3) poses a risk of escape; *and* if the child demonstrates that anything less restrictive would be ineffectual. 34-A M.R.S. §§ 3809 (1), 4109 (1).

39.     Even where these conditions are met, a child cannot be placed in solitary confinement beyond the time necessary to alleviate the behavior. 34-A M.R.S. §§ 3809(2)(C), 4109(2)(C). Any period exceeding 72-hours requires approval in writing from the Commissioner of the Department of Corrections. 34-A M.R.S. §§ 3809(2)(F), 4109(2)(F). Under no

11

circumstances may solitary confinement be used as a punishment. 34-A M.R.S. §§ 3809(2)(C), 4109(2)(C).

40.     Despite these clear statutory restrictions, the MDOC has a long, troubled history in its overuse of solitary confinement on incarcerated children. For example, in 1998, Amnesty International, a human rights organization which focuses on human rights violations under some of the world's most repressive dictatorships, wrote a report highlighting the abuses going on at the Maine Youth Center, (renamed "Long Creek Youth Development Center" following publication of the report). Amnesty Int'l, *Betraying the Young: Human Rights Violations Against Children in the U.S. Justice System* (1998) (hereafter "*Amnesty Report*"). Its investigation found children placed in solitary confinement for lengthy and indefinite periods, including one case exceeding a year, in clear violation of Maine law. *Id* at 27.

41.     In 2017, nearly 20 years after the Amnesty International investigation, the Center on Children's Law and Policy found staff at Long Creek continued to deploy solitary confinement as punishment, in violation of Maine law and facility policy. *Long Creek Youth Development Center Conditions Assessment Narrative Report*, Ctr for Child. L. and Pol., 63 (Sept. 2017) (hereafter "*CCLP Report*").

42.     At the time of Alexander's initial incarceration at Mountain View, corrections officials knew he had been diagnosed with Post Traumatic Stress Disorder (PTSD), Attention Deficit and Hyperactive Disorder (ADHD), Oppositional Defiance Disorder (ODD), a depressive disorder, and had a history of psychiatric hospitalization. They were also aware he had a trauma history and had previously expressed suicidal ideations.

43.     Predictably, from the outset, Alexander struggled with the transition into a carceral environment. At fourteen, he had only ever lived with his parents. He had never been separated from his siblings on whom he depended for emotional support.

44.     Almost immediately, Alexander got into trouble for being disruptive, getting into altercations with staff and other children, and engaging in self-harming behavior. Alexander was a child in acute crisis. He was in desperate need of therapeutic supports. Instead, facility staff led by Juvenile Facility Operations Supervisor (JFOS) Vance, responded by placing Alexander in isolation.

45.     In 2014, upon information and belief, the number of children incarcerated at Mountain View had declined precipitously. The H/D and B Units at the facility was often empty. Mountain View staff repeatedly placed Alexander in isolation in the Special Management Unit, or in the empty H/D or B units for extended periods.

46.     Upon information and belief, during his two years at Mountain View, Alexander was placed in isolation over a dozen times. On multiple occasions he was placed in isolation for behavioral infractions that did not meet the requirements for "observation status" in violation of Maine law.

47.     Further, upon information and belief, Alexander was placed in isolation for periods far beyond those necessary to alleviate the behavior, thus constituting punishment in violation of Maine law and facility policy. On one such occasion while at Mountain View, Alexander spent three months in isolation.

48.     During this time, Alexander was not permitted contact with any other children in the facility. Alexander was not able to attend school classes with the other children. He was not

permitted visitors. He was only able to call his family on the phone when his family could afford to put money on his phone account.

49.     Even when not in an isolation unit, Alexander's ability to interact with other children and staff was strictly limited - in effect keeping him in isolation. From approximately October 2013 to January 2014, Alexander was housed in a pod with other children. However, under the strict direction of JFOS Vance, he was restricted from talking or interacting with any of the other children. He was allowed only to sit in front of his cell window and observe.

50.     Upon information and belief, on all these occasions, the decision to place or keep Alexander in isolation was made by JSFO Vance. It was approved by Superintendent Morin. Any period exceeding 72-hours was approved by Commissioner Ponte.

51.     Under the stress of this excessive isolation, Alexander's mental health deteriorated. It became more difficult for him to control his symptoms. He engaged in more self-harming behavior. He also got in more altercations with staff and other residents. In one such incident, a guard pinned Alexander against a bookshelf. Alexander pushed back. The guard fell. Alexander was charged with assault.

52.     After this incident, Alexander was being transferred to Long Creek. Upon his arrival, Juvenile Program Manager ("JPM") Janosik and JFOS Bouchard sat Alexander down and told him "things were different at Long Creek." They let him know that any misbehavior would be met with severe punishment.

53.     Alexander was immediately placed in the highest risk unit, the Cedar Unit, run by JPM Janosik and overseen by JFSO Lemery. From the outset, JPM Janosik was determined to punish Alexander by placing him in isolation for all infractions, regardless of the severity. When unable to come up with a pretextual infraction, JPM Janosik would manufacture one. He would

14

tell Alexander he "believed he was a risk to himself or property" and that he wanted him out of his unit. Alexander would be sent to segregation for the weekend.

54.    Upon information and belief, as at Mountain View, at Long Creek Alexander was repeatedly placed and kept in solitary confinement for the sole purpose of punishment. Upon information and belief, while at Long Creek, Alexander was repeatedly kept in solitary confinement for extended durations exceeding 72-hours without legal justification.

55.    Upon information and belief, the decision to place or keep Alexander in solitary confinement was made by JPM Lemery or JPM Janosik. It was approved by Superintendent Merrill. Any period of 72-hours was approved by Commissioner Ponte or Commissioner Fitzpatrick.

### Excessive Use of Force and Restraints

56.    In addition to overreliance on solitary confinement, the MDOC has a long and troubled history of use of excessive force and restraints against the children entrusted to its care. The same Amnesty International investigation blew the whistle on unconstitutional use of force and restraints on children incarcerated at the Maine Youth Center in the late 1990s. *Amnesty Report* at 18-19. This included shocking reports of children being placed in a restraint chair for more than seventeen hours. *Id*.

57.    While use of the restraint chair was discontinued in 2001, the Center for Children's Law and Policy Report found that in 2017, Long Creek staff were continuing to use excessive force against children. *CCLP Report* at 55-60. The report found, despite training to the contrary, staff were routinely restraining children, face down on their stomach - creating a risk of asphyxiation. In the cases reviewed, the report authors concluded the children's behavior was closely linked to their mental health conditions. *Id*. at 55-57. Further, in 2018, the American Civil

Liberties Union of Maine filed suit on behalf of an eleven-year-old child formerly detained at Long Creek. Defendant Mullin and another staff member had knocked out his front teeth. *See Ali v. Long Creek Youth Dev. Ctr. et al.*, 2:18-cv-00109-JAW.

58.     As aforementioned, Alexander struggled with his transition from living at home with his family to the prison environment. Again, with full knowledge of Alexander's mental health conditions and history, the MDOC failed to offer therapeutic support. Instead, MDOC staff repeatedly responded to Alexander's cries for help with violence. During his incarceration at Mountain View and Long Creek, Alexander was repeatedly subjected to violent attacks by staff.

59.     Most commonly, these physical assaults were precipitated by minor infractions or in response to Alexander experiencing mental health symptoms. On multiple occasions, Alexander was cornered by multiple officers, tackled, and taken to the ground. On multiple occasions, officers would punch and kick Alexander while he was on the ground.

60.     For example, in approximately summer 2013, Alexander placed a paper over the window of his cell door. In response, Juvenile Program Specialist Jeffrey Macomber opened the door of Alexander's cell, tackled him, and pinned Alexander faced down on his bed. JPS Macomber then got on top of Alexander and wrenched his legs up behind him, with his full body weight on Alexander's back. Alexander cried out in pain and gasped to JPS Macomber that he was having difficulty breathing. In response, JPS Macomber began hitting him in the ribs.

61.     A few months later, in fall 2013, while in isolation at Mountain View, Alexander flooded the floor of his cell. In response, JPS Macomber again entered Alexander's cell and forcibly tackled him, this time slamming Alexander's head into the concrete cell wall. He pinned Alexander to the cement floor while another JPW kicked Alexander in the ribs.

62.     In another instance, following his transfer to Long Creek, Alexander was sitting in another child's cell eating lunch with him.  Long Creek staff determined this to be a violation of facility rules. JPW Chad Sturgis, joined by two other staff members, forcibly entered the cell to extract Alexander. They carried Alexander to another cell. After he was placed in the cell, Alexander moved towards the door. JPW Sturgis grabbed Alexander by the throat and threw him to the cement floor causing him to hit his head on the metal toilet. While pinned to the ground, JPW Sturgis repeatedly punched Alexander in the ribs until another staff member intervened. Alexander was charged with assault.

63.     In September 2014, JPW Mullin arbitrarily decided Alexander would not be permitted to go outside, but instead ordered him to return to his cell. Alexander became upset. In response, JPW Mullin, JPW Brooker, and JPW Young rushed at him. JPW Mullin and JPW Brooker used their full body weight to forcibly slam Alexander against the concrete wall. Along with JPW Young, they held Alexander against the wall, put a spit mask over his face, handcuffed him, and eventually carried him to the Special Management Unit ("SMU") on a gurney.

64.     In addition to excessive force and assault, MDOC staff would also use unnecessary and excessive restraints. On multiple occasions, Alexander was restrained on his stomach with his hands cuffed behind his back, while an officer kneeled on his back and legs.

65.     Shortly after Alexander's arrival at Long Creek, JPM Janosik and JFOS Lemery learned that placing a spit mask over Alexander's mouth and eyes would trigger a severe trauma response. It would cause Alexander to go into an immediate panic state rendering him unable to control his emotions and movements, including uncontrollable sobbing.

66.    Armed with the knowledge of the severe distress the spit mask caused Alexander, JPM Janosik and JFOS Lemery endeavored to use it whenever possible, including occasions when Alexander was on the ground with his hands cuffed and was fully compliant.

67.    For example, on September 22, 2014, Alexander returned to Long Creek following a court date, during which time he learned he was likely going to be committed longer than he anticipated. Alone in the SMU, Alexander began to decompensate. He took his shirt off and threw a plastic crate against the concrete half wall of the empty SMU.

68.    Long Creek staff rapidly responded. JPW Staley, JPW Bouchard, and JPW Atkins officer immediately advanced on Alexander and cornered him. In reaction to the three full-grown male officers closing in on him, Alexander ran at one of the JPWs.  He was immediately tackled to the ground by all three JPWs. The three JPWs were joined by JPM Janosik.

69.    They pinned Alexander and handcuffed him. One JPW put his knee in Alexander's back while another held Alexander's head to the concrete floor by the back of his neck. Alexander went limp on the floor, his shirtless back covered in red marks from where the officers had put their hands on him.

70.    Two minutes later, during which time Alexander remained completely compliant, JPM Janosik placed the spit mask on Alexander's face. The reaction was immediate: Alexander began to panic and cry uncontrollably. He screamed for the officers to take the mask of his face.

Eventually, an officer removed the mask from over his mouth, but left his eyes covered.



*(Fig. 1: Alexander, handcuffed and pinned to the ground by officers with a spit mask over his eyes and mouth.)*



*(Fig. 2: Alexander, handcuffed on the ground after officers removed the spit mask from his mouth.)*

71.     The guards ignored Alexander's continued pleas to take the covering off his face. With his hands and feet still cuffed behind him, they carried him to a gurney, and placed him face down. He was then brought to a cell where he was stripped to his underwear and left on the concrete floor. Following this incident, Alexander was again charged with assault.

### System-wide Discrimination Against Individuals with Disabilities

72.     Juvenile detention facilities such as Long Creek and Mountain View are prohibited under the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act from discriminating against youth because of their disabilities.

73.     Alexander is a qualified individual with mental health disabilities, including ADHD, PTSD, ODD, and depressive disorder. He was diagnosed with these disabilities prior to his commitment to Mountain View. He was, and remains, qualified to receive appropriate accommodation of his disabilities, including during his incarceration at Mountain View and Long Creek.

74.     As early as 1999, a review by correctional experts found that MDOC was failing to provide appropriate staff training on working with children, specifically youth experiencing post-traumatic stress disorder and other behavior management problems. *See* Edward J. Loughran, *Final Report: Review of Maine Youth Center*, 7, 14-15, 22 (Feb. 22, 1999). Instead of appropriate de-escalation, staff responded to children exhibiting symptoms of their mental health conditions with overreliance on physical restraints, placement in isolation, and exclusion from necessary programming. *Id*.

75.     In 2017, nearly two decades later, the CCLP report again found that staff were inadequately trained on use of de-escalation techniques. *CCLP Report* at 55-57. Instead, Long Creek staff resorted to violence, overuse of restraints, and isolation in response to children

exhibiting disruptive behaviors related to their mental health disorders. *Id.* At the time of the release of the Report, Commissioner Fitzpatrick acknowledged they were aware of the high level of mental health care needed by many of the residents at Long Creek. Eric Russell, *Audit Critical of Long Creek Confirmed What Officials Knew, Corrections Chief Says, But Fixes are Being Made*, Portland Press Herald, (Dec. 21, 2017).

76.     In addition to the knowledge that its correctional staff lacked adequate training on the appropriate response to children exhibiting mental illness, upon information and belief, for all the periods material hereto, it had a policy that - despite lacking proper training - its correctional staff would not contact the facility's mental health clinicians to intervene when children with mental health conditions were exhibiting disruptive behaviors. *CCLP Report* at 56.

77.     Most recently, a 2022 investigation by the Department of Justice, Civil Rights Division, found that the State of Maine violated the Americans with Disabilities Act (ADA) by failing to provide mental health treatment to children in the most appropriate settings. Letter from Kristen Clarke, Assistant Att'y Gen., C.R. Division, U.S. Dep't of Just., to Janet Mills, Governor, State of Maine. 1 (Jun. 22, 2022) https://www.justice.gov/crt/case-document/file/1514441/download. Specifically, their investigation found the State of Maine was using Long Creek as a default psychiatric care facility.

78.     Moreover, beginning in 1999, MDOC was on notice that it was failing to provide adequate training to staff on the appropriate response to children with mental health conditions. To this day it has failed to take meaningful corrective action.

79.     As aforementioned, beginning at the time of his initial commitment MDOC officials and staff knew that, because of his disabilities, Alexander suffered from a lack of impulse control and other symptoms that could result in him acting out. Staff were also aware of

Alexander's depressive disorder diagnosis, his history of psychiatric hospitalization, and prior suicide attempts.

80.     Reasonable accommodation of Alexander's known disabilities would have entailed enlisting the assistance of a mental health clinician to appropriately respond to any of Alexander's outburst or self-harming behavior and use de-escalation methods to resolve any direct confrontations. Instead of reasonable accommodation, MDOC staff responded with violent escalation: by cornering Alexander, brutally beating him, affixing a spit-mask to his face, and placing him in solitary confinement.

81.     While in solitary confinement, Alexander was not permitted to attend school classes, and was excluded from other facility programming and events.

82.     As further punishment for Alexander exhibiting symptoms of his disability, MDOC staff would refer all incidents for prosecution by the District Attorneys' Office, ensuring Alexander would remain at the facility for his entire childhood.

83.     For example, as detailed in paragraph 66 through 70 in response to Alexander exhibiting symptoms of acute emotional distress, he was cornered by JPW Staley, JPW Bouchard, and JPW Atkins. In response to the officers advancing on him in a threatening manner, Alexander ran at one of them. He was immediately tackled to the ground, handcuffed, and restrained with a spit-mask over his eyes, nose, and mouth. Alexander was then charged with assault.



*(Fig. 3: Three JPWs cornering Alexander in the SMU, shortly before tackling him to the ground.)*

84.    Similarly, when Alexander engaged in self-harming behavior or, following placement in isolation, experienced further deterioration of his mental health, MDOC staff responded by extending his stay in solitary confinement and, again, referring any behavior resulting from his lack of adequate care and treatment for criminal prosecution.

85.    For example, on or about June 3, 2014, Alexander was placed in isolation following a verbal disagreement with MDOC staff. In solitary confinement, Alexander went into acute crisis. He threatened to kill himself and fashioned a noose out of his bed sheet. He was charged with false public report and criminal mischief.

86.    Upon information and belief, during Alexander's time in MDOC custody, he was referred for twenty additional criminal charges. While at Long Creek, MDOC made referrals for additional prosecutions with such frequency that JPM Janosik would joke to Alexander that it was

his "job security." Upon information and belief, it was MDOC Investigator Joseph Fagone [2] who determined which incidents should be referred to the Cumberland County District Attorneys' Office for prosecution.

87.     In sum, the MDOC was aware, or should have been aware, that children with mental illness, like Alexander, required therapeutic intervention and treatment. In violation of the ADA and Rehabilitation Act, MDOC officials did not enlist mental health clinicians or use de-escalation techniques when Alexander was experiencing symptoms related to his mental illnesses. Instead, MDOC staff assaulted Alexander, punished him through placement in solitary confinement, and criminalized him for behavior directly resulting from their failure to appropriately respond to his disability.

88.     By refusing to provide Alexander with reasonable accommodations for his mental health conditions and punishing him for behaviors resulting from his known disabilities, MDOC deliberately discriminated against Alexander on account of his disabilities.

## **Sexual Abuse**

89.     Sexual abuse of prisoners and detainees by jail or prison staff violates the U.S. and Maine Constitutions. *See Farmer v. Brennan*, 511 U.S. 825 (1994). Because of the power imbalance inherent in the prison environment, Courts have found sex between guards and prisoners to be a per se violation of the Eighth Amendment. *Carrigan v. Davis*, 70 F. Supp. 2d 448 (D. Del. 1999); *see also Williams v. Humphrey*, 2009 WL 1444160 (W.D. Wis. May 20, 2009). Under Maine law it is a Class B crime for an individual in a position of supervisory or disciplinary

---

[2] Mr. Fagone recently lost his license due to an incident in 2011 that gave rise to a federal lawsuit. *See* Editorial Board, "Our View: Consequences Came Far Too Slowly for Officers who Abuse their Power," Portland Press Herald (April 18, 2022) https://www.pressherald.com/2022/04/18/our-view-officers-abused-their-power-but-consequences-came-far-too-slowly/.

authority to engage in a sexual act with an incarcerated individual. 17-A M.R.S. § 253(2)(E). Sexual contact between an individual with supervisory or disciplinary authority and a prisoner or detainee is a Class C crime. 17-A M.R.S. § 255-A(1)(J).

90.     In 2003, Congress passed the Prison Rape Elimination Act to address sexual abuse endemic in prisons and jails nationwide. *See Prison Rape Elimination Act (PREA) of 2003* P.L. 108-79. To comply with PREA requirements, adult and juvenile prisons are required to undergo regular auditing to ensure they meet national standards for both reporting and prevention of sexual abuse in their facilities. *What is a PREA Audit?,* Nat'l PREA Res. Ctr., https://www.prearesourcecenter.org/audit/overview (last visited Jun. 9, 2022).

91.     In an audit conducted in the spring of 2017, Long Creek Youth Development Center was found to be out of compliance with standards set by the Prison Rape Elimination Act. Jake Bleiberg, "Maine Youth Prison Makes Changes After Falling Short In Rape Prevention Audit," MPBN (Oct. 4, 2017) https://www.mainepublic.org/politics/2017-10-04/maine-youth-prison-makes-changes-after-falling-short-in-rape-prevention-audit.

92.     As aforementioned, Alexander arrived at Long Creek in March 2014. He was now farther away from his siblings and family.  He had spent much of his time at Mountain View in isolation. He had been violently attacked by Mountain View staff and now had the stress of additional criminal charges hanging over his head.

93.     It was in this fragile emotional state that he first met Elia Atkinson. JPW Atkinson, or "Ms. A" as he called her, worked as a JPW in the Cedar and Pine Units. JPW Atkinson had garnered a reputation of being a "chill CO." Unlike other officers, she was friendlier to the residents, including Alexander, and would not write the children up for minor infractions like swearing.

94.     However, Alexander's relationship with JPW Atkinson fundamentally and forever changed in October 2014.  During the evening, on or about October 31st, Alexander was locked down in his cell per the usual schedule. Sometime between approximately 9pm and 10pm, he heard his cell door click. Upon hearing the sound, he assumed he was being brought to the segregation unit. Instead, he was surprised to see JPW Atkinson entering his cell. Alexander was especially surprised to see her as, upon information and belief, JPW Atkinson was on personal leave at this time.

95.     Alexander noted immediately that her breath smelled strongly of alcohol. JPW Atkinson proceeded to touch Alexander's genitals. The interaction lasted between ten to fifteen minutes. She then left his cell.

96.     Alexander did not see JPW again until she returned from leave in approximately January 2015. While JPW Atkinson worked primarily in another unit, she would make signals to Alexander when she saw him the hallways.

97.     On or about February 2015, JPW Atkinson stopped Alexander and told him "I think the toilet in your cell is broken." Alexander understood this to mean he should meet her in a storage closet known to not be visible on the facility's security camera system. During that incident, JPW Atkinson performed oral sex on Alexander.

98.     Over the next fourteen months, until Alexander's transfer to CCJ, JPW Atkinson and Alexander had sexual encounters on at least ten other occasions. During these interactions, JPW Atkinson would touch Alexander's genitals, perform oral sex on him, direct Alexander to touch her genitals, or perform oral sex on her.

99.     In April 2016, Alexander was transferred from Long Creek to the Cumberland County Jail. On the day of his transfer, JPW Atkinson told him she would be taking custody of his possessions and would get them to him following his release.

100.    Alexander was released from CCJ in February 2017. Two days later, JPW Atkinson picked him up from his mother's house. Shortly thereafter, they officially began an open dating relationship. It was three days after Alexander's nineteenth birthday. Upon information and belief, in February 2017, Ms. Atkinson was thirty-seven years old.

101.    Initially, Alexander remained at his mother's residence. Ms. Atkinson would regularly pick him up. During this time, as a means of manipulating Alexander, Ms. Atkinson would furnish him with alcohol and suboxone.

102.    In May 2017, Ms. Atkinson left her position at Long Creek. That same month, Alexander moved into her home. Despite no longer having legal disciplinary authority, Ms. Atkinson continued to exert power and control over Alexander.

103.    Increasingly, Alexander began to recognize the abusive and coercive nature of their relationship. On December 5, 2017, Alexander reached out to his former caseworker, Stephanie O'Reilly, and officially reported the sexual relationship that began during his incarceration at Long Creek. Ms. O'Reilly let Alexander know she was required to report the relationship to the superintendent. The next day, she let Alexander know she had made the verbal report and that the superintendent requested the MDOC Investigator, Joseph Fagone, to open an investigation.

104.    Investigator Fagone called Alexander approximately three weeks later. At that time, Alexander detailed the encounters he had with JPW Atkinson during his time at Long Creek. He reported JPW Atkinson had picked him up from his mother's house in February 2017, just days after his release from county jail, and that at that time, they began a relationship. He also reported

that beginning in February 2017, Ms. Atkinson would regularly provide him with alcohol and drugs.

105.    Alexander never heard from Investigator Fagone again.

106.    Alexander later learned that an investigation was opened into Ms. Atkinson by the Maine Criminal Justice Academy (MCJA). On March 9, 2018, the MCJA voted to revoke her certificate of eligibility to be a corrections officer. The basis of the revocation: that she furnished alcohol to a minor in February 2017. There was no mention of a sexual assault allegation.

107.    Alexander subsequently requested information from the MDOC about the investigation. He was provided a one-page document titled "Report to Prisoner Regarding the Status of A PREA Related Investigation." It did not name Ms. Atkinson as a perpetrator, but rather named an individual Alexander had never met.[3]

108.    Ms. Atkinson, meanwhile, went on to take a job with the Department of Health and Human Services, where, upon information and belief, she remains employed as of the time of filing of this Complaint.

---

[3] Based on subsequent research, undersigned counsel believes this individual to be another child who was incarcerated at Long Creek. Based on this individual's age, it is unlikely the individual was incarcerated at Long Creek during the period as Alexander.

## FIRST CAUSE OF ACTION

42 U.S.C. § 1983– Use of Excessive Isolation in Violation of the Fourteenth and Eighth
Amendments of the United States Constitution
(Commissioner Ponte, Commissioner Fitzpatrick, Superintendent Morin, Superintendent Merrill,
JFOS Vance, JFOS Lemery, JPM Janosik)

109.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this Complaint.

110.    Defendants at all times relevant to this action were acting under color of state law.

111.    By routinely placing and approving the placement of Alexander in solitary confinement as punishment and keeping him there for extended durations of time, Defendants violated Alexander's clearly established Fourteenth Amendment right to safety and care while committed to MDOC custody and clearly established right to be free from unreasonable restraint.

112.    By routinely placing and approving the placement of Alexander in solitary confinement as punishment, and keeping him there for extended durations, Defendants violated Alexander's clearly established due process rights guaranteed by Fourteenth Amendment.

113.    By routinely placing and approving the placement of Alexander in solitary confinement as punishment, and keeping him there for extended durations, Defendants violated Alexander's clearly established Fourteenth and Eighth Amendment right to be free from cruel and unusual punishment.

114.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

115.    Pursuant to 14 M.R.S. §853 the statute of limitations was tolled during Alexander's period of incarceration since the cause of action accrued during the period of incarceration. Alexander was released from CCJ less than six years prior to the filing of this Complaint.

## SECOND CAUSE OF ACTION

5 M.R.S. § 4682(1-A) – Use of Excessive Isolation in Violation of Article I, §§ 1, 6, 6-A, and 9
of the Maine Constitution
(Commissioner Ponte, Commissioner Fitzpatrick, Superintendent Morin, Superintendent Merrill,
JFOS Vance, JFOS Lemery, JPM Janosik)

116.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this Complaint.

117.    Defendants at all times relevant to this action were acting under color of state law.

118.    By routinely placing and approving the placement of Alexander in solitary confinement as punishment and keeping him there for extended durations of time, Defendants Ponte, Fitzpatrick, Morin, Merrill, Vance, Lemery, and Janosik violated the "safety" provision of Article I, § 1 of the Maine Constitution, which protects his "inherent and unalienable right[]" to "safety."

119.    By routinely placing and approving the placement of Alexander in solitary confinement as punishment and keeping him there for extended durations of time, Defendants Ponte, Fitzpatrick, Morin, Merrill, Vance, Lemery, and Janosik violated Alexander's clearly established rights under Article I, § 6 of the Maine Constitution, which protects the "[r]ights of persons accused" not to "be deprived of life, liberty, property or privileges," and § 6-A of the Maine Constitution, which protects the right to "due process."

120.    By routinely placing and approving the placement of Alexander in solitary confinement as punishment and keeping him there for extended durations of time, Defendants Ponte, Fitzpatrick, Morin, Merrill, Vance, Lemery, and Janosik violated Alexander's clearly established rights under Article I, § 9 of the Maine Constitution, which guarantees the right to be free from cruel and usual punishment.

121.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

122.    Pursuant to 14 M.R.S. §853, the statute of limitations was tolled during Alexander's period of incarceration since the cause of action accrued during the period of incarceration. Alexander was released from CCJ less than six years prior to the filing of this Complaint.

## **THIRD CAUSE OF ACTION**

42 U.S.C. § 1983 – Use of Excessive Force in Violation of the Fourteenth and Eighth
Amendments of the United States Constitution
(JSO Macomber, JFOS Bouchard, JPM Janosik, JFOS Lemery, JPW Sturgis, JPW Brooker, JPW
Young, JPW Mullin, JPW Staley)

123.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this Complaint.

124.    Defendants Macomber, Janosik, Lemery, Sturgis, Brooker, Young, Mullin, Bouchard, and Staley at all times relevant to this action were acting under color of state law.

125.    Through their violent assault and use of restraints, Defendants Macomber, Janosik, Lemery, Sturgis, Brooker, Young, Mullin, Bouchard, and Staley used excessive force against Alexander for the purpose of causing punishment violating Alexander's rights under the Fourteenth Amendment.

126.    Through their violent assault and use of restraints, Defendants Macomber, Janosik, Lemery, Sturgis, Brooker, Young, Mullin, Bouchard, and Staley used force against Alexander maliciously and sadistically, and for the purpose of causing harm violating Alexander's Eighth and Fourteenth Amendment rights to be free from cruel and unusual punishment.

127.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

128.    Pursuant to 14 M.R.S. §853 the statute of limitations was tolled during Alexander's period of incarceration since the cause of action accrued during the period of incarceration. Alexander was released from CCJ less than six years prior to the filing of this Complaint.

**FOURTH CAUSE OF ACTION**

5 M.R.S. § 4682(1-A) – Use of Excessive Force in Violation of Article I, §§ 1, 6, 6-A, and 9 of the Maine Constitution
(JSO Macomber, JFOS Bouchard, JPM Janosik, JFOS Lemery, JPW Sturgis, JPW Brooker, JPW Young, JPW Mullin, JPW Staley)

129.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this Complaint.

32

130.    Defendants Macomber, Janosik, Lemery, Sturgis, Brooker, Young, Mullin, Bouchard, and Staley at all times relevant to this action were acting under color of state law.

131.    Through their violent assault and use of restraints, Defendants Macomber, Janosik, Lemery, Sturgis, Brooker, Young, Mullin, Bouchard, and Staley used excessive force against Alexander for the purpose of causing punishment in violation of Alexander's rights under Article I, § 1, 6, and 6-A of the Maine Constitution.

132.    Through their violent assault and use of restraints, Defendants Macomber, Janosik, Lemery, Sturgis, Brooker, Young, Mullin, Bouchard, and Staley used force against Alexander maliciously and sadistically, and for the purpose of causing harm, violating Alexander's rights under Article I, § 9 of the Maine Constitution.

133.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

134.    Pursuant to 14 M.R.S. §853, the statute of limitations was tolled during Alexander's period of incarceration since the cause of action accrued during the period of incarceration. Alexander was released from CCJ less than six years prior to the filing of this Complaint.

## **FIFTH CAUSE OF ACTION**

42 U.S.C. § 12132 and 29 U.S.C. § 794
Discrimination Against Qualified Individual with Disabilities in Violation of the Americans with
Disabilities Act and the Rehabilitation Act
(Maine Department of Corrections, Long Creek, Commissioner Ponte, Commissioner
Fitzpatrick, Superintendent Morin, Superintendent Merrill, Investigator Fagone)

135.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this

Complaint

136.    Alexander is a qualified individual with mental disabilities.

137.    Defendants MDOC, Long Creek, and Mountain View are government agencies that

receive federal funding. At all times relevant to this action, Defendants Ponte, Fitzpatrick, Morin,

Merrill, and Fagone were employees of the MDOC.

138.    Defendants MDOC, Long Creek, Ponte, Fitzpatrick, Morin, Merrill, and Fagone,

in their official capacities, intentionally refused to provide reasonable accommodation and thereby

discriminated against Alexander on account of his disabilities, in violation of Alexander's rights

under § 12132, and 29 U.S.C. § 794.

139.    Pursuant to 14 M.R.S. §853, the statute of limitations was tolled during Alexander's

period of incarceration since the cause of action accrued during the period of incarceration.

Alexander was released from CCJ less than six years prior to the filing of this Complaint.

## SIXTH CAUSE OF ACTION

42 U.S.C. § 1983– Sexual Assault in Violation of the Fourteenth and Eighth Amendments of the
United States Constitution
(JPW Atkinson)

140.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this Complaint.

141.    Defendant Atkinson at all times relevant to this action was acting under color of state law.

142.    By repeatedly sexually assaulting Alexander while he was a minor during his incarceration at Long Creek, Defendant Atkinson violated Alexander's Fourteenth Amendment right to safety and care while committed to MDOC custody.

143.    By repeatedly sexually assaulting Alexander while he was a minor during his incarceration at Long Creek, Defendant Atkinson violated Alexander's Fourteenth Amendment right to be free from excessive force and restraint.

144.    By repeatedly sexually assaulting Alexander while he was a minor during his incarceration at Long Creek, Defendant Atkinson violated Alexander's Fourteenth and Eighth Amendment right to be free from cruel and unusual punishment.

145.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future

146.    Pursuant to 14 M.R.S. §853, the statute of limitations was tolled during Alexander's period of incarceration since the cause of action accrued during the period of incarceration. Alexander was released from CCJ less than six years prior to the filing of this Complaint.

## SEVENTH CAUSE OF ACTION

5 M.R.S. § 4682(1-A) – Sexual Assault in Violation of Article I, §§1, 6, 6-A, and 9 of the Maine Constitution
(JPW Atkinson)

147.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this Complaint

148.    By repeatedly sexually assaulting Alexander while he was a minor during his incarceration at Long Creek, Defendant Atkinson violated the "safety" provision of Article I, § 1 of the Maine Constitution, which protects Alexander's "inherent and unalienable right[]" to "safety."

149.    By repeatedly sexually assaulting Alexander while he was a minor during his incarceration at Long Creek, Defendant Atkinson violated Article 1 § 6 of the Maine Constitution which protects the "[r]ights of the persons accused" not to "be deprived of life, liberty, property or privileges," and Article 1 § 6-A, which protects the right to "due process."

150.    By repeatedly sexually assaulting Alexander while he was a minor during his incarceration at Long Creek, Defendant Atkinson violated Article 1, § 9 of the Maine Constitution which guarantees all people the right to be free from cruel and unusual punishment.

151.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional

36

distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

152.    At the time this cause of action arose, Alexander was a minor. Pursuant to 14 M.R.S. §752-C (1) this action may be commenced any time.

## EIGHTH CAUSE OF ACTION

### Assault and Battery (JPW Atkinson)

153.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this Complaint.

154.    By repeatedly sexually assaulting Alexander while he was a minor during his incarceration at Long Creek, Defendant Atkinson intentionally or recklessly caused Alexander to experience an imminent apprehension of harmful or offensive bodily contact and to suffer harmful or offensive bodily contact.

155.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

156.    At the time this cause of action arose, Alexander was a minor. Pursuant to 14 M.R.S. §752-C (1), this action may be commenced any time.

## NINTH CAUSE OF ACTION

42 U.S.C. § 1983 – Failure to Protect in Violation of the Fourteenth Amendment of the
United States Constitution
(Commissioner Ponte, Commissioner Fitzpatrick, Superintendent Morin, Superintendent
Merrill, Investigator Fagone)

157.    Plaintiff Alexander Mascal reasserts and realleges paragraph 1 through 108 in this

Complaint.

158.    At all times relevant hereto, Defendants Ponte, Fitzpatrick, Morin, Merrill, and

Fagone were acting under color of law.

159.    At all times relevant hereto, Defendants Ponte, Fitzpatrick, Morin, Merrill, and

Fagone and their agents and employees were charged with the custody, care, and protection of

Alexander, a minor, and exercised control over Alexander to the exclusion of others. As such, at

all times relevant hereto, Defendants Ponte, Fitzpatrick, Morin, Merrill, and Fagone had a duty to

protect and ensure the safety of Alexander during his incarceration at Mountain View and Long

Creek.

160.    Upon information and belief, during the times relevant hereto, Defendants Ponte,

Fitzpatrick, Morin, and Merrill were aware of the high incidents of excessive use of force,

excessive use of restraints and excessive use of isolation at Mountain View and Long Creek.

161.    Defendants Ponte, Fitzpatrick, Morin, and Merrill knew or should have known that

their failure to intervene directly created an environment where MDOC staff continued to use

excessive force, excessive use of restraints, and excessive use of isolation in violation of

Alexander's Fourteenth Amendment right to safety and care while committed to MDOC custody

162.    Upon information and belief, during the times relevant hereto, Defendants Fitzpatrick, Merrill, and Fagone were aware of the high incidents of reported sexual assaults in juvenile prisons, including multiple annual substantiated reports of sexual assaults at Long Creek.

163.    Upon information and belief, Defendants Fitzpatrick and Merrill knew or should have known that three years preceding the time relevant hereto, Defendant Fagone engaged in serious police misconduct. Defendants Fitzpatrick and Merrill knew or should have known he was unfit to be entrusted with the position of investigating allegations of sexual misconduct at the facility and thus directly contributed to an environment where Long Creek staff could sexually abuse children in violation of Alexander's Fourteenth Amendment right to safety and care while committed to MDOC custody.

164.    Upon information and belief, Defendant Fagone knew or should have known he was failing to fulfill his obligations to investigate and enforce policies to ensure children at the facility were safe from sexual assault. Defendant Fagone directly contributed to an environment where Long Creek staff could sexually abuse children in violation of Alexander's Fourteenth Amendment right to safety and care while committed to MDOC custody.

165.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future

166.    Pursuant to 14 M.R.S. §853, the statute of limitations was tolled during Alexander's period of incarceration since the cause of action accrued during the period of incarceration. Alexander was released from CCJ less than six years prior to the filing of this Complaint.

**TENTH CAUSE OF ACTION**

Intentional Infliction of Emotional Distress
(Investigator Fagone)

167.    Plaintiff Alexander Mascal reasserts and realleges paragraphs 1 through 108 in this Complaint.

168.    At all times relevant to this action and until at least 2020, Defendant Fagone was the employee at MDOC responsible for the investigation of all complaints of sexual misconduct committed by Long Creek staff.

169.    By refusing to investigate Alexander's report of sexual assault by Officer Atkinson, and deliberately covering up Alexander's report by falsifying the document to name another resident at Long Creek whom Alexander had never met, Defendant Fagone intentionally and recklessly engaged in extreme and outrageous conduct.

170.    As a direct and proximate cause and result of the foregoing, Alexander suffered substantial personal injuries of a disabling, debilitating, and permanent nature, severe and prolonged pain and suffering, loss of enjoyment of life, severe permanent mental and emotional distress, and lost income and earning capacity, and will be caused to suffer all of the foregoing losses and damages into the foreseeable future.

## <u>CONCLUSION</u>

WHEREFORE, Plaintiff Alexander Mascal respectfully requests that the Court enter judgment against Defendants on Counts One through Ten and award him compensatory damages as well as any other actual and punitive damages in an amount to be proven at trial, costs, interest, attorneys' fees, litigation costs incurred in bringing this action, and any other relief the Court deems just and equitable.

Dated September 20, 2022, in Portland, Maine.

Respectfully submitted,

*/s/ Thomas Hallett*
_____
Thomas F. Hallett, Bar No. 3142
*Attorney for Plaintiff*
HALLETT WHIPPLE WEYRENS
6 City Center, Suite 208
P.O. Box 7508
Portland, ME 04112-7508
PH: 207-775-4255
*thallett@hww.law*

*/s/ Grainne Dunne*
_____
Grainne Dunne, Bar No. 6738
*Attorney for Plaintiff*
HALLETT WHIPPLE WEYRENS
6 City Center, Suite 208
P.O. Box 7508
Portland, ME 04112-7508
PH: 207-775-4255
*gdunne@hww.law*