AMARI HYLTON,

       Plaintiff,

  vs.

MAINE DEPARTMENT OF
CORRECTIONS, et al.,

       Defendants.

Case 1:22-cv-00292-JAW

### DEFENDANT SCOTT JANOSIK'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rules 7 and 56 and Federal Rule of Civil Procedure 56, Defendant Scott Janosik hereby submits the following statement of material facts in support of his Motion for Summary Judgment. All facts set forth in this document may be considered true for the purposes of summary judgment only. Local Rule 56(g) (facts deemed admitted solely for the purposes of summary judgment shall not be deemed admitted for purposes other than determining whether summary judgment is appropriate).

1. From March of 2014 to April of 2016, Plaintiff Amari Hylton (who, at that time was known as Alexander Mascal) was committed to the custody of Defendant Maine Department of Corrections ("MDOC") and resided at Long Creek Youth Development Center ("Long Creek"). ECF No. 73 ¶¶ 25-26.

2. In April of 2016, MDOC transferred Hylton from Long Creek to the Cumberland County Jail. *Id.* ¶ 100.

3. At the time of the events alleged in Hylton's First Amended Complaint, Janosik was employed by the State of Maine as a Juvenile Program Manager ("JPM") working at Long Creek. Janosik Decl. ¶ 1 (Doc. 142-3, #1222).

4. As a JPM, Janosik was generally assigned to oversee the staff activities and resident programs in the high risk unit, which was also called the Cedar Unit during the latter part of his tenure. *Id.* ¶ 2 (Doc. 142-3, #1222).

5. From time to time during his stay at Long Creek, Hylton was a resident of Cedar Unit. *Id.* ¶ 3 (Doc. 142-3, #1222).

6. Occasionally, it would be necessary to remove a resident from a unit in order to deescalate a situation or to give the resident a safe space in which to calm down – a circumstance the staff sometimes referred to as a "timeout." *Id.* ¶ 4 (Doc. 142-3, #1222).

7. When a resident was in timeout, he or she would frequently be moved to the special management unit ("SMU"), which was a separate unit at Long Creek. *Id.* ¶ 5 (Doc. 142-3, #1222).

8. Timeouts would generally last an hour or less, depending upon whether the situation that gave rise to the timeout had resolved and the resident had committed to safety. *Id.* ¶ 6 (Doc. 142-3, #1222-1223).

9. Hylton understood that rule violations could result in being taken to the SMU. Hylton Dep. at 412/14-21 (Doc. 135-2, #827).

10. Hylton also conceded that he refused to comply with staff orders – which he understood was a rule violation – on more occasions than he could count. *Id.* at 413/3-6 and 414/16-20 (Doc. 135-2, #827).

11. In addition, Hylton sometimes asked for a timeout in the SMU so that he could meet with another Long Creek staff member or to pass a note to another resident. *Id.* at 108/1-3 (Doc. 135-1, #750).

12. For a resident to be moved to the SMU for a timeout or any other reason, the staff would generally require the approval of the facility operations superintendent ("FOS"). Janosik Decl. ¶ 7 (Doc. 142-3, #1223).

13. To the extent Janosik provided information to a FOS concerning a resident's timeout in the SMU, he always provided accurate information. *Id.* ¶ 8 (Doc. 142-3, #1223).

14. For a resident to be reassigned to the SMU from Cedar Unit or any other housing unit, that reassignment had to be reviewed and approved by the superintendent of Long Creek, either directly or through the superintendent's designee. *Id.* ¶ 9 (Doc. 142-3, #1223).

15. To the extent Janosik provided information to the Long Creek superintendent (or the superintendent's designee) concerning a resident's assignment to the SMU, he always provided accurate information. *Id.* ¶ 10 (Doc. 142-3, #1223).

16. Janosik did not have the authority to reassign a resident to the SMU and, therefore, he did not do so during his tenure as a JPM. *Id.* ¶ 11 (Doc. 142-3, #1223).

17. Decisions about how long a resident would be assigned to the SMU or when to reassign a resident from the SMU to a residential unit like Cedar Unit were made pursuant to a plan generated by a team that typically included persons from Long Creek administration, a residential unit manager, social workers, treatment providers, and educators. *Id.* ¶ 12 (Doc. 142-3, #1223).

18. To the extent Janosik provided information to a team relating to a resident's reassignment from the SMU to a residential unit like Cedar Unit, he always provided accurate information. *Id.* ¶ 14 (Doc. 142-3, #1223).

19. Janosik did not determine how long a resident would be assigned to the SMU or when to reassign a resident from the SMU to Cedar Unit or another unit. *Id.* ¶ 15 (Doc. 142-3, #1223).

20. As a plan prepared by such a team after an incident on September 22, 2014 reflects, the team's plan – which was also known as an Intensive Behavior Management Status Plan, or "IBMS plan" – typically addressed the resident's status and behavior, the plan for services while he was in the SMU, and the criteria to be met for return to general population status. *Id.* ¶ 13 (Doc. 142-3, #1223); IBMS Plan (Doc. 142-2 #1220-1221).

21.     In addition to Janosik, the team participants in the September 22 IBMS plan included the Long Creek superintendent and his deputies, a social worker assigned to Cedar Unit, a licensed clinical social worker, and director of classification. IBMS Plan (Doc. 142-2, #1220-1221).

22.     Based on Janosik's experience, when a resident was assigned to SMU pursuant to a plan, he or she continued to engage in some programming, which typically involved contact with residential unit workers, social workers, treatment providers, and educators. Janosik Decl. ¶ 16 (Doc. 142-3, #1223-1224).

23.     For example, the September 22 IBMS plan reflects that Hylton was scheduled to receive educational services while in SMU, to have access to one hour in the fresh air court, to have access to medical and mental health services, and to have contact with staff on a daily basis. IBMS Plan (Doc. 142-2, #1220-1221).

24.     Hylton conceded at his deposition that when he was staying in the SMU, he "sometimes" had access to school staff (depending on their schedules and the terms of his IBMS plan), "sometimes" had access to clinical staff (usually if he was on one-on-ones), "sometimes" met with social workers, was seen by juvenile program workers ("JPW"), and was "sometimes" seen by juvenile program supervisors ("JPS") or JPMs. Hylton Dep. at 423/9-19 (Doc. 135-2, #830); *Id*. at 424/19 to 425/7 (Doc. 135-2, # 830).

25.     Hylton also conceded that while staying in the SMU, he was also allowed to walk around in the dayroom and was "sometimes" allowed on the SMU's outside court. *Id*. at 424/19 to 425/7 (Doc. 135-2, # 830).

26.     Hylton's allegations against Janosik with regard to "isolation" all involve stays in the SMU. *Id*. at 414/21 to 415/8 (Doc. 135-2, #827-28).

27.     Hylton alleges that Janosik sent him to the SMU on several occasions to prevent him from attending "rotary club" functions at Long Creek. Hylton Dep. at 416/1 to 419/3 (Doc. 135-2, #828-29).

28.     He also alleges that Janosik sent him to the SMU on 20 or 30 occasions that were not in response to any rule violations, but may have been in response to Hylton's "manic" or "high energy" behavior. *Id*. at 421/6-422/3 (Doc. 135-2, #829).

29.     Hylton alleges that many of those stays in the SMU lasted about 20 minutes, although he alleges that on some occasions he stayed in the SMU overnight or for a weekend. *Id*. at 421/6-422/9 (Doc. 135-2, #829).

30.     While Hylton alleges that he stayed in the SMU for a week or two on a couple of occasions, he provided no specifics about those instances – only that Janosik allegedly told him that he was acting up or displaying certain behaviors. *Id*. at 421/6-422/9 (Doc. 135-2, #829).

31.     On May 28, 2014, Hylton spit on Janosik and another staff member while being escorted out of the Cedar Unit. Reports at 1-4 (Doc. 137-4, #1027-30); Video at timestamp 0:00 to 1:38 (Doc. 137-5, #1031); Janosik Decl. ¶ 17 (Doc. 142-3, #1224).

32.     Janosik was also aware that Hylton spit on other staff members while he was a resident at Long Creek. Janosik Decl. ¶ 19 (Doc. 142-3, #1224).

33.     It was the practice at Long Creek to use spit masks for the protection of staff members when altercations occurred with residents who spit on staff members. *Id*. ¶ 20 (Doc. 142-3, #1224).

34.     During such incidents, it was the practice of Long Creek staff to advise the residents that spit masks would be removed if the resident committed not to spit and then honored that commitment. *Id*. ¶ 21 (Doc. 142-3, #1224).

35.     An example of the Long Creek staff's practice with regard to the use of spit masks is reflected in the video of an incident on September 18, 2014. Video at timestamp 0:00 to 4:10 (Doc. 139-7, #1094); Janosik Decl. ¶ 22 (Doc. 142-2, #1224); Stoddard Decl. ¶¶ 2-5 (Doc. 142-5 #1231-1232).

36. As the video of the September 18 incident reflects, Hylton spit on an officer during an altercation, which prompted the staff to apply a spit mask. Video at timestamp 0:00 to 4:10 (Doc. 139-7, #1094); Stoddard Decl. ¶¶ 2-5 (Doc. 142-5, #1231-1232).

36a. The video of the September 18 incident further shows that the spit mask is a lightweight hood, of sorts, with a mesh back and a fabric panel for placement over the face. Video at timestamp 0:00 to 4:10 (Doc. 139-7, #1094); Stoddard Decl. ¶¶ 2-5 (Doc. 142-5, #1231-1232).

37. As the video of the September 18 incident further reflects, the staff told Hylton that the spit mask would be removed if he committed not to spit on them. Video at timestamp 0:00 to 4:10 (Doc. 139-7, #1094); Stoddard Decl. ¶¶ 2-5 (Doc. 142-5, #1231-1232).

38. As the video of the September 18 incident reflects, after the staff removed the spit mask, Hylton proceeded to spit on two officers, at which time the spit mask was reapplied. Video at timestamp 0:00 to 4:10 (Doc. 139-7, #1094); Stoddard Decl. ¶¶ 2-5 (Doc. 142-5, #1231-1232).

39. As the records of the September 18, 2014 indicate, Janosik was not present for this altercation or this use of the spit mask. Report at 2-3 (Doc. 139-6, #1093); Reports at 1-5 (Doc. 139-9, #1096-1100); Tarpinian Decl. ¶¶ 2-5 (Doc. 142-4, #1228-1229).

40. Janosik never used a spit mask on a resident for any reasons other than to respond to a resident who spit on staff members and to protect Long Creek staff. Janosik Decl. ¶ 23 (Doc. 142-3, #1224).

41. Janosik never authorized use of a spit mask on a resident for any reasons other than to protect Long Creek staff and to respond to a resident who spit on staff members, threatened to spit on staff members, or who had a history of spitting on staff members. Janosik Decl. ¶ 24 (Doc. 142-3, #1224).

42. Janosik was never present for the use of a spit mask on a resident in any situation other than to protect Long Creek staff and to respond to a resident who spit on staff members,

threatened to spit on staff members, or who had a history of spitting on staff members. Janosik Decl. ¶ 25 (Doc. 142-3, #1224).

43.     With regard to an incident on September 22, 2014 that Hylton references in his First Amended Complaint, FOS Francois Bouchard – and not Janosik – was the officer in charge and the person who directed Juvenile Program Worker ("JPW") Dezaray DeBurra to place a spit mask on Hylton. *Id.* ¶¶ 26-27 (Doc. 142-3, #1224-1225); Report at 2-3 (Doc. 139-11, #1103-04); Reports at 1, 2 & 4 (Doc. 142-1, #1211-1212 and 1214); Tarpinian Decl. ¶¶ 2-5 (Doc. 142-4, #1228-1229).

44.     During the incident on September 22, Janosik did not place a spit mask on Hylton, he did not order the use of the spit mask, nor did he decide how the spit mask would be used. Janosik Decl. ¶ 28 (Doc. 142-3, #1225); Report at 2-3 (Doc. 139-11, #1103-04); Reports at 1, 2 & 4 (Doc. 142-1, #1211-1212 and 1214); Tarpinian Decl. ¶¶ 2-5 (Doc. 142-4, #1228-1229).

45.     Based on Hylton's behavior at Long Creek, Janosik recalls Hylton was involved in more incidents in which force was used than the average resident of Cedar Unit. Janosik Decl. ¶ 29 (Doc. 142-3, #1225).

46.     Hylton was aware that Long Creek staff could use force to ensure the safety and security of the facility. Hylton Dep. at 412/22 to 413/2 (Doc. 135-2, #827).

47.     Hylton does not recall how many times he refused to comply with staff orders, but he concedes it was too many to count. *Id.* at 414/16-20 (Doc. 135-2, #827).

48.     Hylton does not allege that Janosik personally used excessive force with regard to him. *Id.* at 429/23 to 430/2 (Doc. 135-2, #831).

49.     Janosik does not recall any incidents in which he used force with regard to Hylton. Janosik Decl. ¶ 30 (Doc. 142-3, #1225).

50.     If Janosik had been present for any incidents involving Hylton in which he believed the staff at Long Creek had used more force than was reasonably necessary for self-

defense, protection of others, protection of property, prevention of escapes, or the maintenance control, he would recall it. *Id.* ¶ 31 (Doc. 142-3, #1225).

51.     Janosik does not recall being present for any incidents involving Hylton in which he believed the staff at Long Creek had used more force than was reasonably necessary for self-defense, protection of others, protection of property, prevention of escapes, or maintenance control. Janosik Decl. ¶ 32 (Doc. 142-3, #1225).

52.     Hylton alleges that Janosik directed or encouraged other staff members to use excessive force in dealing with him. Hylton Dep. at 430/3-6 (Doc. 135-2, #831).

53.     Hylton further alleges that he was present on 10 to 15 occasions in which Janosik directed officers to use force in dealing with him. *Id.* at 430/9-17 (Doc. 135-2, # 831).

54.     However, Hylton could recall specific facts of only two incidents in which Janosik allegedly directed staff to use force on him. *Id.* at 435/16 to 439/13-16 (Doc. 135-2, #833-34).

55.     Hylton alleges that on one occasion, Janosik instructed staff to "rip [Hylton] out of [his] room" because Hylton refused to lock down, although Hylton admitted that he ended up walking out of his room with another staff member without any use of force. *Id.* at 435/16 to 436/2 (Doc. 135-2, #833).

56.     This was the same incident – one that occurred on May 28, 2014 – in which Hylton spit on Janosik and another officer. *Id.* at 435/16 to 436/7 (Doc. 135-2, #833).

57.     The video of the May 28 incident and the staff reports both reflect that essentially no force was used. Reports at 1-4 (Doc. 137-4, #1027-30); Tarpinian Decl. ¶¶ 2-5 (Doc. 142-4, #1228-1229); Video at timestamp 0:00 to 3:32 (Doc. 137-5, #1031) Stoddard Decl. ¶¶ 2-5 (Doc. 142-5, #1231-1232).

58.     To the contrary, the video of the May 28 incident shows officers communicating with Hylton through the door of his room and convincing him to walk to the SMU, which Hylton proceeds to do without Long Creek staff using physical force. Video at timestamp 0:00 to 3:32 (Doc. 137-5, #1031) Stoddard Decl. ¶¶ 2-5 (Doc. 142-5, #1231-1232).

59. On the other occasion in which Hylton alleges Janosik directed staff to use force on him, Janosik allegedly told staff to "gear up" to remove him from his room and take him to the SMU after Hylton gained possession of a makeshift weapon, i.e., a pen with a staple in it. Hylton Dep. at 436/8 to 437/5 (Doc. 135-2, #833); Reports at 1-2 (Doc. 138-3, #1044-45); Tarpinian Decl. ¶¶ 2-5 (Doc. 142-4, #1228-1229).

60. Hylton further alleges that when he laid down under his bed, Janosik called the JPM of the female unit – "Ms. Peavee" – to talk to Hylton. Hylton Dep. at 436/8 to 437/5 (Doc. 135-2, #833).

61. Hylton does not allege that the staff eventually used force to remove him from his room as part of this incident. *Id.* at 436/8 to 437/5 (Doc. 135-2, #833).

62. Notably, the facility records for this incident – which occurred on June 6, 2014 – including the report prepared by JPM Beth Peavey, confirm that force was not used to remove Hylton from his room and to get him to the SMU. Reports at 1-2 (Doc. 138-3, #1044-45); Tarpinian Decl. ¶¶ 2-5 (Doc. 142-4, #1228-1229).

63. Janosik does not recall giving any specific instructions to Long Creek staff about when to use force or how much force to use in regard to Hylton. Janosik Decl. ¶ 33 (Doc. 142-3, #1225).

64. Janosik never instructed any Long Creek staff to use more force than was reasonably necessary for self-defense, protection of others, protection of property, prevention of escapes, or maintenance control with regard to Hylton. Janosik Decl. ¶ 34 (Doc. 142-3, #1225).

65. Hylton attended team meetings to address his phase level at Long Creek. Hylton Dep. at 423/20-22 (Doc. 135-2, #830).

66. Those team meetings were attended by social workers, classification officers, JPMs, and education staff. *Id.* at 423/20 to 424/1 (Doc. 135-2, #830).

67. Hylton never made any complaints to that team about Janosik's conduct. *Id.* at 423/20 to 424/5 (Doc. 135-2, #830).

68.     Hylton did not submit any grievances to Long Creek administration about Janosik's conduct. *Id.* at 452/2-7 (Doc. 135-2, #837).

Dated at Portland, Maine this 14th day of October, 2025.

Attorneys for Defendant Scott Janosik
MONAGHAN LEAHY, LLP
2 Monument Sq., Ste. 401, P.O. Box 7046
Portland, ME 04112-7046
(207) 774-3906
jwall@monaghanleahy.com
BY:     /s/ John J. Wall, III
John J. Wall, III

## CERTIFICATE OF SERVICE

I hereby certify that on the date indicated below, I electronically filed **Defendant Scott Janosik's Statement of Material Facts in Support of Motion for Summary Judgment** using the CM/ECF system, which will provide notice to me and all other counsel of record.

Dated at Portland, Maine this 14th day of October, 2025.

Attorneys for Defendant Scott Janosik
MONAGHAN LEAHY, LLP
2 Monument Sq., Ste. 401, P.O. Box 7046
Portland, ME 04112-7046
(207) 774-3906
jwall@monaghanleahy.com
BY:     /s/ John J. Wall, III
John J. Wall, III